UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, STATE
OF NEW YORK, *EX REL.* LUCIE GABRIEL,

                Plaintiff,

      - against -

BROOKLYN PLAZA MEDICAL
CENTER,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ECF CASE

**FILED IN CAMERA AND UNDER SEAL**

COMPLAINT AND JURY DEMAND

        Plaintiff Lucie Gabriel ("Gabriel" or "plaintiff") complains of defendant Brooklyn Plaza Medical Center ("BPMC" or "defendant") as follows:

NATURE OF THE ACTION

        1.    This is an action under the Federal False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA"), and the New York State False Claims Act, N.Y. State Fin. Law § 187 et seq. ("NY FCA"), to recover damages and civil penalties on behalf of the United States and the State of New York arising from BPMC's false claims. BPMC (i) knowingly presented, or caused to be presented to the United States and the State of New York a false or fraudulent claim for payment or approval; (ii) knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim to get such a claim paid or approved by the United States and the State of New York; and (iii) knowingly made, used or caused to be made or used a false or fraudulent record or statement material to an obligation to pay or transmit money or property to the government, and knowingly concealed and improperly avoided or decreased an obligation to pay or transmit money or property to the United States and the State of New York.

2.     Plaintiff also brings this action pursuant to the anti-retaliation provisions of the FCA, 31 U.S.C. § 3730(h), and the NY FCA, N.Y. State Fin. Law § 191, to remedy defendant's firing of, and retaliation against, plaintiff for her conduct in furtherance of actions pursuant to the FCA and NY FCA, including her investigation and disclosure of, and refusal to participate in, the activities described herein that she reasonably believed to be in violation of law, or fraudulent or criminal.

3.     Through a number of improper practices, BPMC knowingly submitted false claims to the United States and the State of New York.  BPMC re-hired a consultant to review its billing records who had been involved in previous cost-reporting violations; the consultant deliberately and falsely reclassified numerous private patient bills as bills for treatment of indigent patients, which BPMC then submitted in support of its requests for reimbursements from the governments of the United States and the State of New York.  Another violation involved BPMC's practice since 2001 of requesting and receiving reimbursements from the federal and state-funded Medicaid program for care provided to Medicaid-eligible patients at a BPMC facility that did not have an operating certificate from the New York State Department of Health, and thus was not eligible for Medicaid reimbursements.   BPMC nevertheless submitted reimbursement requests for such treatment by falsely representing that the treatment had been provided at its main clinical facility which did have a valid operating certificate.  These practices, and others discussed below, were improper under state and federal rules and regulations; as a result, BPMC obtained from the United States and the State of New York millions of dollars in funds to which it was not entitled.

4.     Plaintiff's causes of action under the FCA and NY FCA are brought on behalf of the United States of America and the State of New York to recover all damages,

penalties and other remedies established by and pursuant to the FCA and the NY FCA. As <u>qui</u> <u>tam</u> plaintiff authorized by 31 U.S.C. § 3730(d) and N.Y. State Fin. Law § 190(6), Gabriel claims entitlement to a portion of any recovery obtained by the United States and the State of New York.

JURISDICTION AND VENUE

5.      The Court has jurisdiction over the FCA claims pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

6.      This Court also has supplemental jurisdiction over plaintiff's NY FCA claims pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367 because those claims closely relate to the FCA claims. The FCA and NY FCA claims arose from the same transactions or occurrences and share a common nucleus of operative facts, such that the FCA and the NY FCA claims form part of the same case or controversy.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391, because the unlawful practices complained of herein occurred within the Eastern District of New York.

PARTIES

8.      BPMC hired plaintiff/relator Gabriel, a resident of the State of New York, as a receptionist in or about December 1998. She was promoted to Billing Supervisor in 2001 and then promoted to Billing Manager in 2004. Gabriel worked as the Billing Manager until she was fired on or about September 14, 2009. As the Manager of the Billing department, Gabriel supervised a staff of six people and oversaw the process of billing payors, such as Medicaid and private insurers, for patient care.

9.      Gabriel graduated from Prospect Heights High School and attended Brooklyn College for three years. She worked for BPMC for more than eleven years.

10.     Defendant BPMC is a non-profit corporation and federally-funded community health clinic in Fort Greene, Brooklyn. Its main medical facility is located at 650 Fulton Street, Brooklyn, New York 11217 ("Main Clinic"). It also operates two satellite facilities: the Whitman Ingersoll Farragut Health Center, 297 Myrtle Avenue, Brooklyn, New York 11205 ("Whitman-Ingersoll Clinic"), and the School-Based Health Center, 77 Clinton Avenue, Brooklyn, New York 11205. At its three locations in Fort Greene, Brooklyn, BPMC has approximately 70 to 80 employees, including doctors, social workers, nutritionists, HIV counselors, lab technicians and others.

11.     Upon information and belief, BPMC has an annual budget of over $6 million, and receives approximately $2.5 million in grant funding from the U.S. Department of Health and Human Services Health Resources and Services Administration ("HRSA"), which oversees federally-funded health centers. In addition, approximately 80% of BPMC's patients have incomes at or below the poverty line; as a result, most of BPMC's remaining revenues are obtained through the Medicaid program and through a program that reimburses medical providers for uncompensated care to indigent patients ("Indigent Care Pool"). The Medicaid program and Indigent Care Pool are administered by the State of New York, with federal and state funding.

## FACTUAL ALLEGATIONS

### Background

12.     Medicaid, a public assistance program providing for payment of medical expenses for low-income patients, is administered on a state-by-state basis. Funding for Medicaid is provided by federal and state governments. In New York, the federal government gives Medicaid funds to the State which pools the federal monies with its own Medicaid funding

and then distributes the pool of money to hospitals and other health care providers in New York to pay for medical care to Medicaid-eligible patients. New York State Department of Health ("NY DOH") administers the Medicaid program for the State of New York

13.     The Medicaid program adheres to certain federal regulations and other guidelines that set forth the rules that each Medicaid health care provider must follow in calculating and submitting claims for reimbursement. As discussed below, health care providers are paid per-visit at a pre-determined Medicaid reimbursement rate for care provided to Medicaid-eligible patients. The Medicaid reimbursement rate is different for each health care provider; it is set based upon the health care provider's actual costs as reported in its cost reports, which every recipient of Medicare or Medicaid funding is required to submit to federal and state agencies annually.

14.     Medicaid Managed Care is a program that provides for the delivery of Medicaid health benefits and additional services through an arrangement between a state Medicaid agency and managed care organizations ("MCOs"). MCOs are either 1) managed care companies such as New York Child Health Plus and Family Health Plus, which are state-funded programs to provide care to low-income people who do not meet Medicaid's income-eligibility requirements, or are otherwise ineligible for Medicaid; or 2) private insurance companies/Health Maintenance Organizations. For most primary patient care services, MCOs accept a set payment – known as "capitation" – for services to Medicaid Managed Care patients. Medicaid Managed Care patients are assigned to receive services through a primary care provider such as BPMC, which contracts with MCOs to receive a fixed monthly fee from each MCO for each Medicaid Managed Care patient, based on age, enrolled to receive services at the primary care provider's

hospitals or clinics. The monthly fee is paid on a per-patient basis regardless of how many services the patient actually receives.

15. HRSA is the primary federal agency for improving access to health care services for people who are uninsured, isolated or medically vulnerable. HRSA provides funding through grants, known as 330 grants, to federally-qualified health centers ("FQHCs") to provide health care to uninsured people, people living with HIV/AIDS, and pregnant women, mothers and children.

16. BPMC is a FQHC and receives its primary funding through HRSA's 330 grant. BPMC receives approximately $2 million annually through its 330 grant. Other federal and state grants BPMC receives include the Ryan White grant for HIV services, and grants for providing services such as pre-natal care, and for providing services to indigent patients and in public schools and public housing.

17. The Indigent Care Pool is a program the State of New York administers with federal and state funding. It is designed to give health care providers an incentive to offer services to indigent patients. Indigent Care Pool funds are distributed based on health care providers' uncompensated care to "self-pay" patients; that is, to those patients who did not have private or government health insurance. Such patients include individuals who cannot not afford private insurance but earn too much to qualify for Medicaid; who fail to get certified or re-certified for Medicaid; and who do not qualify for Medicaid, for example, because they are undocumented. Self-pay patients are charged for visits using a sliding scale based on their income; health care providers are allowed to seek government reimbursements for the difference between the sliding scale amounts charged to self-pay patients and the "cost" of the self-pay patient visits, known as the "uncompensated cost base." The Indigent Care Pool pays the health

care provider a percentage of its uncompensated cost base: the government pays the provider a higher percentage of its total uncompensated cost base as the provider's self-pay visits as a percentage of total visits increases.

BPMC's Reimbursement Process

18.     Each year, BPMC reports its costs associated with patient care to the United States Department of Health and Human Services through forms from the Center for Medicare and Medicaid Services ("CMS").   These reports are referred to as "Cost Reports." BPMC's fiscal year ends on December 31; within five months thereafter, BPMC is required to submit its Cost Reports to the Medicare and Medicaid programs.    BPMC also provides the Medicaid Cost Report data, in the same or similar form, to the NY DOH.

19.     The Cost Report forms state that the intentional misrepresentation or falsification of any information in the reports violates federal law, and could result in fines and/or imprisonment.

20.     Since 2000, FQHCs such as BPMC receive Medicaid payments based on a prospective payment system established in the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000.  The prospective payment system establishes a per visit payment rate for each FQHC each year, to be applied to the following year; that rate is referred to as the Medicaid reimbursement rate.  The FY 2001 Medicaid reimbursement rate was based on the average of the FQHC's allowable Medicaid costs in its Cost Reports in fiscal year ("FY") 1999 and FY 2000.  Since FY 2001, the government has set the Medicaid reimbursement rate by making annual adjustments to the previous year's rate to account for inflation by using the Medicare Economic Index.

21.     BPMC bills Medicaid weekly through the NY DOH for patient care it provides to Medicaid-eligible patients at the Medicaid reimbursement rate.  Medicaid typically remits payment within days.

22.     In addition, each year BPMC must submit a Uniform Data System Report ("UDS Report") to HRSA by March 31.  The UDS Report is required of every FQHC receiving grant funding through HRSA, and is used to ensure compliance with grant requirements, and for monitoring and evaluating providers' performance.  Information required in the UDS Report includes administrative, financial and demographic data, as well as information on utilization rates for various services and programs.  HRSA requires FQHCs to provide complete and accurate UDS data to receive grant awards.

23.     HRSA uses information provided in the UDS Report to develop performance measures such as user growth rates, productivity, and costs per patient encounter; the performance measures are used to determine whether grant awards to an FQHC should increase or decrease the following year.  In addition, information contained in BPMC's UDS Report and Medicaid Cost Reports, such as its indigent patient population and self-pay patient visits, is used to determine BPMC's annual reimbursement from the Indigent Care Pool.

24.     BPMC also submits various monthly and quarterly reports to federal and state agencies in support of its payments and reimbursements from the federal and state programs discussed above.

### BPMC's Reporting and Management Structure

25.     As Billing Manager, plaintiff reported to BPMC's Chief Financial Officer ("CFO").  BPMC has employed seven different CFOs since 1998: Elaine Thompson was CFO from March 2002 to August 2006, when she resigned; Charlesworth Gordon served from

September 2006 until he was fired in December 2006; Robert Fliegel began in January 2007 and resigned six months later in June 2007; Sanjay Shah started that same month and resigned in April 2008; IJR Consulting, an outside consulting firm, was hired to perform the CFO duties from May 2008 until July 2009; and Qumar Menzor ("Menzor"), the CFO when Gabriel was fired, began in August 2009.

26.     Lazetta Duncan-Moore ("Duncan-Moore") was BPMC's Chief Executive Officer ("CEO") at the time of plaintiff's firing.  Duncan-Moore had been on BPMC's Board of Directors until 2003; she then worked in BPMC's Human Resources department until 2008, and then became the Chief Operating Officer until she was elevated to CEO in February 2009.

27.     Duncan-Moore is the only management-level employee who has worked at BPMC at the time of every one of the cost reporting violations since 2004, discussed below.

28.     The Billing, Payroll and Accounts Payable Departments at BPMC all reported to the CFO, who reported to the CEO.  The CEO, as well as the CFO and COO, each reported to BPMC's Board of Directors.

29.     BPMC has also employed seven different CEOs since 1998.  Between May 2005 and February 2009, when Duncan-Moore became CEO, BPMC had four different CEOs.

<u>BPMC's Past Conduct</u>

30.     Since 2005, HRSA and the NY DOH have conducted a number of investigations of cost reporting and other reimbursement-related violations at BPMC.

31.     Gabriel identified and reported many of the violations discussed below. As a result, the government has conducted audits and directed BPMC to repay over-reimbursements received from government health care programs.

32. In many instances, after making repayments for its violations, BPMC either made no effort to institute meaningful reforms to end the improper practices, or resumed its improper practices shortly afterward.

33. In 2004 and 2005, Gabriel learned that BPMC doctors were submitting inaccurate billing information for patient visits, resulting in over-reimbursements from Medicaid. BPMC was eventually required to pay back Medicaid $500,000 in over-reimbursements.

    a. In 2004, Gabriel began to have suspicions that BPMC doctors were submitting inaccurate billing information on their "encounters" for patient visits. Encounters are forms prepared after each patient visit that provide summary information about the patient and the doctor's notation of a billing code and payor information for the treatment provided. The billing (or non-billing) code and payor information determine whether BPMC will receive a reimbursement for the service provided and, if so, from whom.

    b. Gabriel began cross-checking the encounter forms against the patients' medical charts. Specifically, she compared the billing code listed on the encounter form for each patient visit against the patient's medical chart for that same visit. The charts of the patients' visits revealed that, in many instances, BPMC doctors had not provided adequate documentation to support their use of billing codes that characterized the services as billable "visits."

    c. On several occasions in 2004 and 2005, plaintiff informed BPMC's then-CFO, Elaine Thompson ("Thompson"), that BPMC's doctors were submitting inaccurate and/or incomplete encounter forms for patient visits. Thompson eventually resigned because of the numerous billing-related violations occurring at BPMC.

d.      Based on Gabriel's identification of these violations, in 2006 the NY DOH conducted an audit of BPMC's billing records and reimbursements; it determined that BPMC had been over-reimbursed by approximately $500,000 because of inadequate documentation in its charts to justify the treatment of certain services as "visits." The NY DOH's finding was released in January 2008. After delaying for more than a year, BPMC in February 2009 finally began repaying the $500,000 over-reimbursement from Medicaid.

e.      Despite the repayment in 2009 for over-reimbursements during 2004 and 2005, BPMC never instituted protocols or guidelines or took any other steps to ensure that violation would no longer occur. Indeed, as discussed below, as of the time of Gabriel's dismissal, BPMC doctors continued to use improper billing codes to increase BPMC's Medicaid payments.

34.      In late 2008, Duncan-Moore retained a company called Millin Associates ("Millin") to conduct a "sweep" of BPMC's billing systems, ostensibly to find instances in which bills had been overlooked and gone unpaid; the goal of the project was to include such bills in BPMC's next reimbursement request. As described below, Millin's services were a scam; BPMC had to pay back Medicaid reimbursements it received based on the unpaid bills Millin purportedly found.

a.      BPMC's alleged purpose in hiring Millin was to identify bills that were eligible for Medicaid reimbursement but, for whatever reason, Medicaid had not reimbursed. Under its arrangement with BPMC, Millin received as its fee 25% of the total amount BPMC recouped based on Millin's review of the billing records.

b.      In fact, the lost bills Millin identified based on its review of BPMC's billing system were fictitious.

c.     When Millin provided its findings to BPMC for reimbursement, Gabriel checked the results against BPMC's billing and hospital records. She found that Millin had simply made up hospital visits and associated bills. Gabriel reviewed Millin's figures on her own initiative; she had not been directed to do so by anyone at BPMC.

d.     In December 2008 and January 2009, Gabriel told IJR Consulting, which was acting as CFO at the time, about Millin's illegal conduct. IJR Consulting instructed Millin to provide records supporting its findings. Millin was not able to do so. BPMC repaid to the Medicaid program the approximately $400,000 in reimbursements it had received based on Millin's findings.

35.     In August 2009, the NY DOH also found reimbursement violations in BPMC's Prenatal Care Assistance Program ("PCAP"). Upon information and belief, BPMC has made, or soon will make, reimbursements to Medicaid for over-reimbursements associated with its PCAP program.

a.     Under Medicaid, comprehensive prenatal care programs such as BPMC's PCAP program receive a lump-sum payment for each PCAP patient. BPMC must then provide the patient with all pre-natal services, including lab testing, diagnostics, etc.

b.     However, BPMC regularly collected the lump-sum for PCAP patients, and then referred those patients to outside labs and diagnostic centers. This procedure allowed BPMC to keep the PCAP funds without incurring associated testing and diagnostic costs, and resulted in double-billing when the outside centers submitted reimbursement requests to Medicaid for the same services.

c.     Gabriel had identified the problem with the PCAP billing in late 2006 in an internal report to then-CFO Charlesworth Gordon ("Gordon"). BPMC ignored

Gabriel's findings, and removed her from a committee charged with addressing issues with the PCAP program. BPMC also fired Gordon when he pressed BPMC management to address Gabriel's findings.

       d.     Despite NY DOH's identification of violations in BPMC's PCAP program, the improper practices continue. At the time of plaintiff's firing, BPMC continued to refer PCAP patients to outside lab and diagnostic centers. Indeed, at around the time of Gabriel's firing in September 2009, BPMC was again cited for violations concerning billing practices associated with its PCAP program.

Double-Billing Violation

       36.     During the period from 2002-2005, BPMC paid for the services of Ollie Wigfall ("Wigfall"), a billing and information systems consultant. Wigfall made changes to BPMC's billing system that resulted in BPMC reporting almost twice as many patient encounters, or visits, as it actually conducted.

       a.     With the knowledge and under the direction of BPMC management, including Duncan-Moore, Wigfall set up BPMC's accounting and billing system so that BPMC billed both Medicaid and Medicaid Managed Care providers (often in violation of regulations) for services provided to Medicaid Managed Care patients. Wigfall doubled the number of hospital visits by treating each bill, instead of each patient encounter, as one visit (such that two bills for the same patient visit, one to Medicaid and one to Medicaid Managed Care, were counted as two visits).

       b.     Wigfall also made up patients and assigned them "visits" to increase BPMC's reported number of patient visits. Wigfall would go through the phonebook to

identify individuals who lived in the same zip code as BPMC and then add them to the system as BPMC patients.

      c.     Wigfall's billing and accounting changes deliberately resulted in exaggerated patient visits. In that way, BPMC was able to recover federal and state grant money to which it was not entitled. Most of BPMC's grants require the grantee service provider to treat a minimum number of patients to remain eligible. However, BPMC did not have enough actual visits to keep many of its grants, including HRSA's 330 grant. Thus, false figures were included in BPMC's annual UDS Reports, and were used to obtain the 330 grant and other grant funding.

      d.     BPMC would not have been eligible for much of the funding described above if it had reported accurate figures. Indeed, HRSA requires complete and accurate information in the UDS Reports for an FQHC to qualify for funding. Gabriel estimates that between 2003 and 2006, as a result of fraud, BPMC received approximately $10 million in grants that it otherwise was not entitled to receive.

      e.     Gabriel observed that the visits BPMC reported increased dramatically after Wigfall's changes to BPMC's billing system, and were not consistent with her own figures. Upon reviewing the billing records, Gabriel realized what Wigfall was doing. BPMC's billing system created an invoice, or identification, number for each visit; bills associated with a given visit were always tagged with that visit's identification number. Wigfall created a separate identification number for each bill associated with the same visit (for example, when BPMC billed an MCO and Medicaid for portions of the same visit); as a result, BPMC's system reflected two separate visits. Gabriel informed then-CFO Elaine Thompson ("Thompson"), who initiated an internal investigation to review BPMC's records to identify the

correct number of encounters, or visits. However, at Duncan-Moore's direction BPMC forced Thompson to resign before her investigation was completed; it was never concluded.

f.      These improper billing practices eventually ended in 2006 when Medicaid began requiring greater documentation to support reimbursement requests. However, as discussed below, similar and related violations continue.

g.      BPMC never returned improper reimbursements based on Wigfall's accounting and billing practices before 2006. However, at the recommendation of the New York State Department of Health, Wigfall was fired as a consultant in 2006 because of errors and inadequacies in BPMC's billing and accounting systems, and because he charged BPMC exorbitant consulting fees.

<u>Current Cost Reporting Violations</u>

37.     Despite its long history of billing and reporting violations, BPMC continued to submit false claims to the government for reimbursement. The violations set forth below were not previously known to, or addressed by, the government.

38.     In addition, as set forth below, BPMC fired plaintiff instead of taking corrective action to address the most recent violations she had identified. Therefore, BPMC submitted false Cost Reports and supporting documents to the United States and New York governments knowingly, and in deliberate ignorance and reckless disregard of the truth or falsity of the information submitted.

39.     In May 2009, shortly after Duncan-Moore became BPMC's CEO, she re-hired Wigfall as a billing and information systems consultant. As discussed above, Wigfall had worked as a consultant at BPMC previously; BPMC had not renewed his contract after his involvement in several of BPMC's past billing violations.

268987 v1                                              15

40.    Upon information and belief, Wigfall and Duncan-Moore are longtime friends. In addition, Wigfall's wife is a former CFO of BPMC.

41.    Shortly after Duncan-Moore re-hired Wigfall in May 2009, he began falsely and fraudulently altering patient bills associated with the treatment of BPMC's indigent patient population to inflate the number of services BPMC provided to self-pay patients. As a result BPMC treated the costs of those misclassified services as uncompensated care and obtained improper reimbursements from the Indigent Care Pool by including "costs" of such fabricated services in BPMC's annual UDS Report and Medicaid Cost Reports to the governments of the United States and the State of New York.

a.    BPMC is eligible to receive reimbursements from the Indigent Care Pool for unpaid bills associated with services provided to indigent patients who did not have private or government insurance; those individuals are considered "self-pay patients." As discussed in Paragraph 17, supra, such patients include individuals who cannot not afford private insurance but earn too much to qualify for Medicaid; who fail to get certified or re-certified for Medicaid; and who do not qualify for Medicaid, for example, because they are undocumented. Self-pay patients are charged for visits using a sliding scale based on their income. The Indigent Care Pool pays the health care provider a higher percentage of its uncompensated costs of treating self-pay patients, called its "uncompensated cost base," as the provider's level of uncompensated care increases.

b.    BPMC may seek reimbursement from the Indigent Care Pool for a percentage of its total "uncompensated cost base," which is the difference between the amount of money self-pay patients were required to pay per visit based on a sliding scale (usually around $25) and BPMC's self-pay rate of reimbursement (usually around $165), aggregated for all self-

pay patients.   In other words, the uncompensated cost for each self-pay visit is the difference between the amount the self-pay patient is required to pay and the "cost" of providing services to that patient, that is, the self-pay reimbursement rate.  The greater the percentage of BPMC's total clinic visits that are "uncompensated" self-pay visits, the greater the percentage of BPMC's uncompensated cost base that the Indigent Care Pool reimburses.  Thus, by classifying bills as uncompensated self-pay bills in BPMC's billing system, Wigfall was able to increase both the uncompensated cost base and the percentage of the cost base that the government reimbursed.

c.      Wigfall took bills for private patients, "wrote off" the amount billed to the private insurer, and altered the patient account information so the patient appeared as a self-pay patient.   Wigfall did so for patients who had received services as recently as two days before Wigfall wrote off their bills and converted them to self-pay patients.

d.      Upon information and belief, from the time Wigfall was re-hired until plaintiff's firing, Wigfall wrongfully and deliberately wrote-off and re-classified as self-pay (rather than privately insured) BPMC patients having approximately $2 million of bills.

e.      BPMC included the false increase in its uncompensated cost base in the most recent UDS Report and Medicaid Cost Reports that it submitted to the federal and state governments. As a result, upon information and belief BPMC has received or will receive an over-reimbursement of approximately $1.5 to 2 million from the Indigent Care Pool; the monies in that pool are provided by the United States and the State of New York. By inflating the number of self-pay patient visits, BPMC also inflated the indigent patient population it served, and created a false figure that it used to justify its grant funding levels.

f.      In addition, in some instances BPMC obtained reimbursements twice for the same service: once through the Indigent Care Pool for bills re-classified as services

to self-pay patients, and again when private insurance reimbursed BPMC for the same service based on a bill sent before Wigfall made the fraudulent reclassification.

g.     Gabriel realized something was wrong when she received payments from private insurers for bills that had been already written off in BPMC's billing system. In addition, Gabriel noticed that reports she regularly ran began showing large bad debt writeoffs, and that some of those writeoffs were for bills associated with very recent visits. Gabriel reported her findings to the CFO, Menzor.   Menzor reported Gabriel's findings to Duncan-Moore.  As discussed below, Gabriel's identification and reporting of this violation resulted in her firing.

42.    Wigfall also continues to inflate the total number of patient visits, as he had done before 2006, see Paragraph 36, supra.  While in the past he created false patients and visits in the billing system, Wigfall, since he was rehired, simply presents deliberately inflated figures to the CFO for reporting purposes.

a.     BPMC keeps monthly records of total patient visits, including breakdowns by health professional, by location of service, and by insurance/payor.  Wigfall does not provide the CFO with total visits based on those reports; he instead reports an inflated figure sufficient to support BPMC's grant requirements.

b.     By reporting inflated patient visits, BPMC is able to qualify and/or maintain eligibility for grants to which it would otherwise not be entitled, including the HRSA 330 grant.

c.     Gabriel informed IJR Consulting, which was serving as CFO at the time, that the number of patient visits Wigfall reported was different from the detailed figures she maintained on a monthly basis.  When Menzor became CFO, Gabriel informed him of that

18

discrepancy. IJR Consulting and Menzor raised the difference between Gabriel's substantiated figures and Wigfall's unsubstantiated figures to Duncan-Moore, but Duncan-Moore continued to use Wigfall's figures.

43.  BPMC also engaged in practices resulting in improper reimbursements from the federal and state-funded Medicaid program.

44.  In 2001, BPMC opened the Whitman-Ingersoll Clinic at a public housing project in Fort Greene, Brooklyn. That clinic never received its operating certificate from the New York Department of Health because the clinic failed to meet certification standards, and therefore was not eligible to receive Medicaid reimbursements. Nevertheless, since the Whitman-Ingersoll Clinic's opening, BPMC has submitted requests for reimbursement from Medicaid for care provided at the Whitman-Ingersoll Clinic.

a.  BPMC was able to obtain reimbursements from Medicaid for visits at the Whitman-Ingersoll Clinic by falsely representing that the services were provided at BPMC's Main Clinic which does have an operating certificate. BPMC falsely designated services provided at the Whitman-Ingersoll Clinic as having been provided at the Main Clinic by using the Main Clinic's National Provider Identification number, or locator code, on the bills submitted to Medicaid for such services. By doing so, BPMC obtained reimbursements from Medicaid to which it was not entitled.

b.  Every reimbursement BPMC received for a patient seen at the Whitman-Ingersoll Clinic since its opening has been based on false reporting to the government. Each such visit, compensated at the Medicaid rate of reimbursement in effect for that year, was obtained on the basis of fraud.

c.      BPMC further concealed its fraud by transporting medical charts for patients seen at the Whitman-Ingersoll Clinic to the Main Clinic whenever the Department of Health conducted its routine audits.

d.      Gabriel informed every CFO she worked under that the Whitman-Ingersoll Clinic did not have an operating certificate.  In almost every instance, the CFO came back to Gabriel and told her that management's instructions were to continue billing visits at the Whitman-Ingersoll Clinic.

45.     BPMC also obtained improper reimbursements from Medicaid by inflating the number of Medicaid Managed Care patient visits.  Because of regulations allowing FQHCs to recover from Medicaid the difference between the monthly payments from MCOs and BPMC's actual costs of care per visit, BPMC, by exaggerating the number of Medicaid Managed Care visits, was able to obtain a greater number of make-whole payments from Medicaid.

a.      Usually, BPMC received from each MCO with which it contracted a fixed monthly amount for every person, based on age, that MCO assigned to receive patient care services through BPMC.  BPMC received the same amount from the MCO regardless of how many times the patient visited BPMC that month.

b.      However, FQHC's can recover from Medicaid the difference between the MCO's total payments and the FQHC's cost of treating Medicaid Managed Care patients, based on the Medicaid reimbursement rate.  The payment of that difference is known as a "wraparound" payment.  For BPMC, the fixed payments from MCOs were usually around $30 per month, while the Medicaid reimbursement rate per visit was approximately $175.

c.      For each visit by a Medicaid Managed Care patient, BPMC recovered a wraparound payment from Medicaid.  The wraparound payment per visit is

determined by subtracting BPMC's total revenue from MCOs from the total "cost" of Medicaid Managed Care patient visits (Medicaid reimbursement rate of $175 x the number of visits), and dividing that figure by the total number of Medicaid Managed Care patient visits.

d.      The wraparound payment per visit is less than the difference between the approximately $30 per month average MCO payment and BPMC's $175 Medicaid reimbursement rate per visit because in some instances MCOs paid BPMC more than the fixed monthly amount per Medicaid Managed Care patient. For example, for HIV patients, MCOs paid higher amounts, and paid them per-service. As a result, BPMC's wraparound payment in 2009 was approximately $65. For a Medicaid Managed Care patient who had five primary care visits in a month, BPMC would receive $30 from the MCO, but could recover $325 ($65 x 5) from Medicaid through wraparound payments.

e.      Thus, BPMC sought to inflate the number of visits from Medicaid Managed Care patients to increase its wraparound payments from Medicaid. To do so, BPMC improperly treated brief follow-up visits and non-billable interactions as visits subject to reimbursement. However, under Medicaid regulations, a visit occurs when the provider triages the patient, identifies a chief complaint, addresses that chief complaint, and presents a resolution or course of treatment for the complaint; those elements must be reflected in the patient's chart.

f.      For example, if as part of a physical, a patient required a tuberculosis test, the initial visit for the physical would be a legitimate visit for billing purposes; the follow-up to check the results of the tuberculosis test, or to review the results of other lab or diagnostic tests, would not be a new visit under Medicaid regulations. However, BPMC doctors falsely designated such events as independent visits on the encounter forms used for billing

purposes.  The doctors should have designated those events on the encounter forms as non-billable visits.

g.      As a result, BPMC overstated the number of visits by Medicaid Managed Care patients, and thus received larger wraparound payments from Medicaid.

h.      Gabriel identified this violation when she observed that BPMC was using billing code V6759 too often; billing code V6759 is for visits classified as billable follow-up visits.  When Gabriel reviewed medical charts associated with such bills, she saw that the charts did not contain comments reflecting a follow-up visit; in most cases, the charts contained no comments at all.  Gabriel raised her findings with each CFO who supervised her, but BPMC's Medical Director, Dr. Franck Leveille, and other BPMC managers took no action to correct the illegal practices.

46.     Through the practices described above, BPMC knowingly sought and obtained Indigent Care Pool and Medicaid reimbursements from the United States and the State of New York to which it was not entitled.  By engaging in these practices, BPMC violated state and federal regulations, and falsely obtained millions of dollars in reimbursements from the United States and the State of New York.

47.     BPMC has not paid money back to the United States or the State of New York for over-reimbursements based on the violations above.

48.     In light of BPMC's past conduct, its current violations demonstrate that BPMC's practice is to ignore billing and cost reporting issues until the government forces BPMC to address them.  Such inaction is part of BPMC's concerted effort to appear unaware of its improper practices and resulting over-reimbursements.

49.     Despite its past violations, BPMC took no efforts to improve its compliance systems or practices.  For example, even though Millin was able to manipulate BPMC's billing system to create false "unpaid" bills, BPMC took no steps to secure its billing system against such fraud.  Instead, shortly after the Millin-related violations, Wigfall was able to manipulate BPMC's billing system to designate falsely bills as bad debts.

50.     Moreover, since at least 2004, BPMC has maintained two sets of financial statements: one for internal reporting and a separate set of financial statements for reporting to the government.

51.     In addition, despite Gabriel's diligent efforts to investigate and identify improper practices, BPMC made no efforts to correct the violations she discussed with management. Finally, in or around April 2009, Gabriel contracted the Department of Health and Human Services' Office of Civil Rights and explained, among other things, each of the violations discussed above; in addition, in or around June and July 2009, Gabriel further detailed the violations above to the Office of the Inspector General.

52.     BPMC's past conduct and its failure to take corrective action demonstrate that its cost reporting violations were committed knowingly, and with deliberate ignorance and reckless disregard for the falsity of the information it submitted in its Cost Reports and UDS Reports.

<u>BPMC's Retaliatory Firing of Gabriel</u>

53.     BPMC fired Gabriel because of her diligent efforts to investigate and rectify billing errors and other violations resulting in overpayments to BPMC from Medicaid.

54.     As discussed in Paragraphs 31-36, plaintiff initiated a number of investigations into billing and reporting violations at BPMC.  As a result of these investigations,

BPMC was required to pay back hundreds of thousands of dollars in government reimbursements it had improperly obtained.

55.     In addition to identifying past violations, in July and August 2009 Gabriel informed BPMC management about Wigfall's improper bad debt writeoffs. In July, she told officials at IJR Consulting, which was performing the role of CFO at the time; those officials told Duncan-Moore, who took no action.

56.     In August 2009, Menzor became the new CFO. Gabriel promptly informed him about Wigfall's improper billing entries that inflated the number of self-pay patient visits. Menzor met with Gabriel to try to understand her concerns and then spoke to Wigfall; Wigfall told Menzor that he was following instructions from Duncan-Moore.

57.     Menzor then discussed the issue with Duncan-Moore. He recommended to her that Wigfall be fired, but she would not allow it.

58.     On or about September 11, 2009, Menzor asked Gabriel to provide him with any information she could regarding Wigfall's violations. Plaintiff agreed to do so.

59.     On September 14, 2009, just three days later, and before Gabriel could provide Menzor with the extensive documents and other information concerning Wigfall's misconduct, she was fired.

60.     Plaintiff was called into a meeting with Tracie McDaniel ("McDaniel"), a consultant serving as COO at the time, and Menzor. McDaniel handed Gabriel a termination letter signed by Duncan-Moore and told Gabriel that she had been fired because BPMC was "going in a different direction." Both McDaniel and Menzor told her that it was not their decision and that they thought she was a great employee.

61.     Gabriel later learned that, according to Menzor, Duncan-Moore had wanted to "get rid of" her because of Duncan-Moore's fear that Gabriel would not keep quiet about BPMC's cost reporting violations.

62.     By firing plaintiff, BPMC acted affirmatively to ensure that no corrective actions would, or could, be taken to address the unlawful actions plaintiff had investigated and identified, and that those problems would not be reported to government agencies or to BPMC's Board of Directors.

63.     Gabriel did not receive written or oral performance reviews, and she has never received any criticisms of her performance.

64.     The vague explanation BPMC gave for firing plaintiff was baseless.  It was intended to mask the real reason for Gabriel's dismissal: her investigation of, and complaints about, BPMC's billing and cost reporting violations, including violations she reported to BPMC management in the weeks before her firing.

## FIRST CAUSE OF ACTION

### Federal False Claims Act

65.     Plaintiff repeats and realleges paragraphs 1-64 of this Complaint as if fully set forth herein.

66.     Plaintiff claims treble damages and penalties under the FCA, 31 U.S.C. § 3729 et seq.

67.     By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval to the United States.

68. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to get such claims paid or approved by the United States.

69. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to an obligation to pay or transmit money or property to the government, and knowingly concealed and improperly avoided or decreased an obligation to pay or transmit money or property to the United States.

70. Each of the original and amended Cost Reports and UDS Reports, and the requests for payment from Medicaid and the Indigent Care Pool, that BPMC submitted to the federal and state health insurance programs represents a false claim for payment or approval. Each document and form associated with the violations set forth above that BPMC submitted to the federal and state health insurance programs as part of the Cost Reports and UDS Reports, and that BPMC submitted in support of requests for payment from Medicaid and the Indigent Care Pool, represents a false record or statement material to a false or fraudulent claim. Each document and statement associated with the violations set forth above that BPMC submitted, presented or made to government officials related to audits, investigations, reviews and meetings with government officials, represents a false record or statement for the purpose of concealing, improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

71. The United States, unaware of the falsity of the records, statements and claims made or caused to be made by the defendant, paid and continues to pay claims that would not be paid but for the false or fraudulent nature of those records, statements and claims.

72.    By reason of defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

SECOND CAUSE OF ACTION

False Claims Act – Retaliation

73.    Plaintiff repeats and realleges paragraphs 1-72 of this Complaint as if fully set forth herein.

74.    By virtue of the acts described above, defendant violated 31 U.S.C. § 3730(h) by terminating plaintiff's employment because of lawful acts she undertook in furtherance of an action under the FCA, including initiating, participating in, and disclosing an investigation of False Claims Act violations.

75.    As a result of defendant's retaliatory actions, plaintiff suffered and continues to suffer substantial damages, including damages for emotional distress and humiliation.

76.    Defendant acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

THIRD CAUSE OF ACTION

New York False Claims Act

77.    Plaintiff repeats and realleges paragraphs 1-76 of this Complaint as if fully set forth herein.

78.    Plaintiff claims treble damages and penalties under the NY FCA, N.Y. State Fin. Law § 189(1).

79.     By virtue of the acts describe above, defendant knowingly presented or caused to be presented, false or fraudulent claims for payment or approval to the State of New York.

80.     By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to get such claims paid or approved by the State of New York.

81.     By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to an obligation to pay or transmit money or property to the government, and knowingly concealed and improperly avoided or decreased an obligation to pay or transmit money or property to the State of New York.

82.     Each of the original and amended Cost Reports and UDS Reports, and the requests for payment from Medicaid and the Indigent Care Pool, that BPMC submitted to the federal and state health insurance programs represents a false claim for payment or approval. Each document and form associated with the violations set forth above that BPMC submitted to the federal and state health insurance programs as part of the Cost Reports and UDS Reports, and that BPMC submitted in support of requests for payment from Medicaid and the Indigent Care Pool, represents a false record or statement material to a false or fraudulent claim. Each document and statement associated with the violations set forth above that BPMC submitted, presented or made to government officials related to audits, investigations, reviews and meetings with government officials, represents a false record or statement for the purpose of concealing, improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

83.     The State of New York, unaware of the falsity of the records, statements and claims made or caused to be made by the defendant, paid and continues to pay claims that would not be paid but for the false or fraudulent nature of those records, statements and claims.

84.     By reason of defendant's acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### New York False Claims Act – Retaliation

85.     Plaintiff repeats and realleges paragraphs 1-84 of this Complaint as if fully set forth herein.

86.     By virtue of the acts described above, defendant violated N.Y. State Fin. Law § 191 by terminating plaintiff's employment because of lawful acts she undertook in furtherance of an action under the NY FCA, including initiating, participating in, and disclosing an investigation of NY FCA violations.

87.     As a result of defendant's retaliatory actions, plaintiff suffered and continues to suffer substantial damages, including damages for emotional distress and humiliation.

88.     Defendant engaged in retaliatory actions with wanton negligence and reckless indifference to plaintiff's statutory rights.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

(a)     ordering that defendant cease and desist from violating 31 U.S.C. § 3729 et seq., and N.Y. State Fin. Law § 187, et seq.;

(b) assessing damages against defendant in an amount equal to three times the amount of damages sustained by the United States and the State of New York because of defendant's actions, as well as a civil penalty of not less than $5,000 and not more than $10,000 for each violation of 31 U.S.C. § 3729(a), and not less than $6,000 and not more than $12,000 for each violation of N.Y. State Fin. Law § 189(1);

(c) awarding plaintiff/relator the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and N.Y. State Fin. Law § 190(6);

(d) awarding plaintiff reinstatement and assessing damages against defendant in an amount equal to twice the backpay; interest on backpay; compensatory damages, including damages for emotional distress and humiliation; and punitive damages resulting from defendant's unlawful termination of plaintiff/relator's employment in violation of 31 U.S.C. § 3730(h) and N.Y. State Fin. Law § 191;

(e) awarding plaintiff the costs of this action together with reasonable attorneys' fees and costs;

(f) awarding plaintiff prejudgment interest;

(g) awarding plaintiff damages to compensate for any adverse tax consequences of the award; and

(h) granting such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs demand a

trial by jury in this action.

Dated: New York, New York
      September 29, 2010

                                      VLADECK, WALDMAN, ELIAS
                                        & ENGELHARD, P.C.

By:              _____

                                        Debra L. Raskin
                                        Anand Swaminathan
                                        Attorneys for Plaintiffs
                                        1501 Broadway, Suite 800
                                        New York, New York 10036
                                        (212) 403-7300